UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA              )
                                      )
          v.                          )    Case No. 3:19-CR-46 JD
                                      )
JOSHUA RAY                            )

## OPINION AND ORDER

On May 22, 2019, after obtaining a search warrant, law enforcement executed a search of

Mr. Joshua Ray's home at 54340 Kerryhaven Drive, Elkhart, Indiana. During the search, two

agents also interviewed Mr. Ray in one of the bedrooms of the home. Mr. Ray faces several

charges for the unlawful possession of one or more machine guns and firearms in violation of 18

U.S.C. § 922 and 26 U.S.C. §§ 5861(d), 5861(e), and 5861(j). [DE 51]. Mr. Ray now moves to

suppress the evidence and information obtained from the search of his home as well as his

statements to the agents. [DE 22]. He argues that the affidavit provided in support of the search

warrant contained false statements and misleading omissions that were material to the

application for the search warrant. Mr. Ray also asks the Court to suppress his interview with

two federal agents that occurred while the search was being executed claiming that the agents did

not properly advise him of his *Miranda* rights and did not obtain a voluntary statement from him.

*Id*.

On December 4, 2019, the Court held an evidentiary hearing under *Franks v. Delaware*,

438 U.S. 154 (1978) to examine the sufficiency of the warrant and to assess Mr. Ray's claims

under *Miranda v. Arizona*, 384 U.S. 436 (1966). The Court stated that the evidentiary hearing

would remain open until after a decision was issued on several discovery matters raised in the

hearing and that it would grant the parties another opportunity to present evidence. [DE 71].

After issuing a decision on the discovery matters [DE 89], the Court held the second part of the

1

evidentiary hearing on February 25, 2020, and the parties called witnesses and presented additional evidence. [DE 100]. After the hearing was closed, the Court allowed the parties to submit final briefs and the defendant filed a brief on March 3, 2020, thereby making the motion to suppress ripe for review. [DE 102]. For the reasons set forth below, the Court finds that the warrant did not contain any material false statements or omissions that were made intentionally or recklessly and that Mr. Ray was properly advised of his *Miranda* rights. The Court therefore denies Mr. Ray's motion to suppress.

## I. FACTUAL BACKGROUND

In May of 2019, the Department of Homeland Security intercepted a package addressed to Mr. Ray that was shipped from China and that contained forty suspected Glock auto switch conversion devices ("switches"). An auto switch conversion device can transform a semiautomatic Glock pistol into a machine gun by enabling "a Glock pistol to shoot automatically more than one shot, without manual reloading, with a single function of the trigger." [GE 1 at 3]. Department of Homeland Security records demonstrated that more than twenty packages originating from China had been shipped to Mr. Ray's home at 54340 Kerryhaven Drive, Elkhart, Indiana since July of 2018.

Homeland Security Agent Geoffrey Howard submitted an affidavit in support of the application for a search warrant for Mr. Ray's home. Agent Howard also worked with Special Agent Kyle Lerch from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") in preparing the affidavit. After obtaining the search warrant, a task force made up of agents from Homeland Security, ATF, and the Elkhart Police Department executed a search of Mr. Ray's home on May 22, 2019. Officers knocked on the front door, asked about the possibility of a gas leak before breaching the entrance with weapons drawn. After securing the home and moving

Mr. Ray's family members to the kitchen, Agent Howard and Agent Lerch escorted Mr. Ray to one of the bedrooms in the home.

While other law enforcement officers conducted a search of the home and monitored his family members in the kitchen, Agents Howard and Lerch interviewed Mr. Ray for approximately an hour and a half. The first third of the interview was inadvertently not recorded by the agents and the remaining two thirds of the interview was recorded.[1] During the portion of the interview that was not recorded, the agents advised Mr. Ray of his *Miranda* rights, the agents read a *Miranda* waiver form aloud to him, and Mr. Ray signed the waiver of his *Miranda* rights. As a result of the search, agents seized multiple firearms and Mr. Ray's cellphone. [DE 22 at 1; DE 71].

## II.    DISCUSSION

As stated at the outset, Mr. Ray now seeks to suppress the evidence and information that came out of the search of his home, as well as any statements made to the agents during the interview. Previously, the Court denied his argument that the search warrant was so broad as to make it a general warrant. [DE 59]. Mr. Ray advances two remaining legal arguments: first, that the affidavit provided in support of the search warrant contained false statements and misleading omissions that were material to the application for the search warrant; and second, that the agents carrying out the search warrant did not properly advise him of his *Miranda* rights and did not obtain a voluntary statement from him. As explained below, Mr. Ray's arguments are insufficient to support the suppression of evidence, information, or the interview completed during the search of his home.

---

[1] The transcript of the recorded portion of the interview with Mr. Ray was admitted at the first hearing. [Def. Ex. I].

### A. *Franks* Hearing to Review the Affidavit Supporting the Search Warrant

First, Mr. Ray argues that the affidavit supporting the search warrant contained false statements and misleading omissions that were material to the application for the search warrant. Mr. Ray contends that both Agent Howard and Agent Lerch knew the statements in the affidavit were false at the time they were made and, therefore, the affidavit and the associated search warrant violates the Fourth Amendment by using "deliberately falsified allegations to demonstrate probable cause." *Franks*, 438 U.S. at 168.

"Under *Franks*, evidence seized pursuant to a warrant must be suppressed when the defendant shows by a preponderance of the evidence that (1) the affidavit in support of the warrant contains false statements or misleading omissions, (2) the false statements or omissions were made deliberately or with reckless disregard for the truth, and (3) probable cause would not have existed without the false statements and/or omissions." *United States v. Williams*, 718 F.3d 644, 647 (7th Cir. 2013). When a *Franks* hearing has been granted, the district court is "required to first determine whether the defendant has shown by a preponderance of the evidence that the false information was provided intentionally or recklessly, and if so, whether the affidavit, stripped of the false information, is nevertheless sufficient to establish probable cause." *United States v. Spears*, 673 F.3d 598, 604 (7th Cir. 2012). Here, Mr. Ray has failed to prove by a preponderance of the evidence that the warrant application contained a material falsity or omission that would have altered the issuing judge's probable cause determination for the search warrant. *See United States v. Clark*, 935 F.3d 558, 563 (7th Cir. 2019).

### 1. False Statements in the Affidavit

Mr. Ray first alleges that Agent Howard made a materially false statement in the affidavit in support of the search warrant. [DE 22 at 4]. More specifically, Mr. Ray argues that Agent

Howard knew there were other potential legal uses for the switches aside from their use on Glock firearms and argues that the switches could also be used on airsoft guns.[2] In paragraph seventeen of the affidavit, Agent Howard stated that "there is no legitimate use for an auto sear device unless one has a firearm attach[ed] to it. The device is designed solely to convert a firearm into a machine gun." [Def. Ex. H at 061]. Mr. Ray claims that this statement is false because the switches can be attached to airsoft guns, which are not firearms. Therefore, he argues that the switches that were shipped to his home have a legitimate and legal purpose apart from their use on firearms. *Id.* at 5. Mr. Ray also disagrees with the statement that the switches were "designed solely to convert a firearm into a machine gun." *Id.* at 061. He asserts that the switches were advertised online to work on airsoft guns and not to create machine guns. [Def. Ex. A-D]. Mr. Ray's central claim is that if the switches had a separate, legal function, then the switches would not be *per se* illegal and the search warrant would have lacked the probable cause required to search his residence for the switches.

In support of his argument, Mr. Ray points to several instances in his interview with Agent Howard and Agent Lerch where they stated that the switches could be used on *both* airsoft guns and real Glock pistols. In the recorded portion of their interview, Agent Howard makes two statements to that effect.[3] Thus Mr. Ray argues that Agent Howard did not tell the magistrate judge that the devices had a legitimate and separate use aside from being placed on firearms. The government contends that the agents were responding to Mr. Ray when they stated that the

---

[2] Airsoft guns are replica guns which utilize bottled gas, such as compressed propane, as a propellant and shoots plastic projectiles as ammunition. Airsoft guns are often designed to look exactly like real firearms, but since they only shoot small plastic projectiles, they are legal to own and use.

[3] Agent Howard's two statements are as follows:
"But you knew those switches could be used for two different things, for the airsoft as well as going on a real Glock pistol." [Def. Ex. I at 18].
"You're selling him these switches that we all know can go on airsoft pistols but they also can go on Glock pistols, you know." *Id.*

switches could be used with airsoft guns. [DE 49 at 10]. At the first hearing, Agent Howard testified that Mr. Ray was the first person in the interview to bring up the idea of using switches on airsoft guns. [DE 71]. Agent Howard explained that he and Agent Lerch referenced airsoft guns in their conversation with Mr. Ray as "a way to try and get him to potentially talk more about the switches and with the hopes that he would admit to us that he knew that they could also be used on actual real Glock pistols." [DE 71]. The Court notes that the first mention of the word "airsoft" in the transcript of Mr. Ray's interview is on page six where Agent Howard is repeating what was discussed while the audio recorder was turned off. [Def. Ex. I at 6]. Thus, there is no record of who said the word "airsoft" first. As evidence, Mr. Ray also admitted one video from YouTube demonstrating a man using a switch on a Tokyo Marui airsoft gun to show that switches may also be used on airsoft guns. [Def. Ex. E].

At the *Franks* hearing, Agent Howard testified about his general knowledge of switches and what they are used for. [DE 71]. Specifically, Agent Howard testified that the purpose of the device was to place it on a firearm in order to turn it into a machine gun. Agent Howard noted that he had been involved in a previous case where similar switches were intercepted in the mail and seized by law enforcement. He stated that he relied on the knowledge of the postal inspectors seizing the switches at the border because they were in violation of federal law and therefore were designated as contraband. *Id*. Agent Howard explained that the switches, by designation, are an illegal item—they are considered machine guns as they convert semi-automatic firearms into machine guns. Notably, Agent Howard also testified that he did not know the switches could be used on airsoft guns, that he had never seen a switch attached to an airsoft gun and noted that the switches have the "Glock" symbol stamped on them indicating their use for Glock firearms. [GE 6]. In preparing the affidavit in support of the search warrant, Agent Howard testified that

he knew that a package containing forty switches addressed to Mr. Ray had been seized. He also knew that Mr. Ray had ordered several similar packages in the past and that he had a permit to carry firearms, therefore he believed it was likely that numerous firearms and illegal switches were at the house.

Mr. Ray was unable to demonstrate that Agent Howard knew the switches could be used on airsoft guns or that he intentionally included false information about the switches in the affidavit. *See Spears*, 673 F.3d at 607. In fact, Agent Howard's testimony indicated the opposite—he was unaware that they could be used on airsoft guns and did not carry out any specific research on the switches because he knew they were labelled as contraband. Agent Howard stated, "I'm relying on the fact that these are being seized as contraband at the border because they are machine guns or machine gun parts to make that assertion." [DE 71]. Unlike Mr. Ray's assertion that Agent Howard should have researched what the switches could be used for, Agent Howard testified that the basis of his statements in the affidavit came from their designation as contraband and that they were in violation of federal law once shipped into the United States. Agent Lerch also testified that his knowledge of the switches and their capability came from the NFA and other federal agents. [4]

Moreover, Mr. Ray was unable to demonstrate that the switches could even be used on airsoft guns. In the second half of the *Franks* hearing, the government's witness, Officer James Barlow—a firearms enforcement officer for the ATF, testified that the ATF was unable to successfully attach a switch onto an airsoft gun. Officer Barlow explained:

> And when you look at how the airsoft gun operates, the switch installed in the airsoft gun has no function. There's no parts to interact with. The switch itself is designed to work with a striker fired pistol which the Glock is and airsoft guns

---

[4] Agent Lerch testified to this fact, "In speaking with the NFA branch and speaking with Ray Wolfenbarger, I knew that they had been placed on Glock pistols specifically Glock pistols and convert the firearm from a semi-automatic firearm to a full auto machine gun." [DE 71].

operate on a hammer principle. They look like Glocks on the outside but internally
they have a hammer like other airsoft guns, so there's nothing for the switch to do.

[DE 100]. He explained that when he installed the Glock switch onto a Glock airsoft gun nothing

happened because there was nothing for the switch to do on the airsoft gun. Officer Barlow

stated that when the switch is installed on a real Glock pistol, it turns it into a machine gun by

making it fully automatic, but when installed on an Airsoft gun, it does not make it fully

automatic because the internal parts do not work in a similar manner. Finally, as for the YouTube

video admitted by Mr. Ray [Def. Ex. E], Officer Barlow testified that the airsoft gun used in the

video is a customized Tokyo Marui airsoft gun and that it was custom-built by the man in the

video. Officer Barlow also stated that the clip device or switch utilized on the airsoft gun in the

video is not the same type of switch that was seized from Mr. Ray.

After reviewing the evidence and listening to testimony at both hearings, the Court finds

that Agent Howard did not make a false statement in the affidavit by stating that the switches

were designed to go on firearms. Mr. Ray failed to carry his burden by proving by a

preponderance of the evidence that the switches in question had any alternative legal uses or that

they could even be used on airsoft guns. Notably, Mr. Ray has not proved that the switches can

be used on airsoft guns. Mr. Ray provided one foreign video from YouTube of a person utilizing

a custom device similar to a switch with an airsoft gun to show that it is possible. But Agent

Barlow testified that the airsoft gun used in the video is a custom-made airsoft pistol from

Thailand and that the ATF were unable to attach one of the switches that were seized from Mr.

Ray's house to a Glock airsoft gun. [DE 100]. Agent Barlow also testified that the Airsoft guns

do not have the parts to engage with the switch and, therefore, nothing happens when the switch

is installed on the Airsoft gun. Mr. Ray has failed to show there are any legitimate uses for the

switches other than being utilized with a firearm, has also failed to show that the switches can be

used with Airsoft guns, and has failed to show that Agent Howard's assertions in paragraph seventeen of the affidavit were materially false.

"A search warrant affidavit establishes probable cause when it sets forth facts sufficient to induce a reasonably prudent person to believe that a search thereof will uncover evidence of a crime." *United States v. Roth,* 201 F.3d 888, 892 (7th Cir. 2000); *United States v. Gregory*, 795 F.3d 735, 741 (7th Cir. 2015). The facts submitted by Agent Howard in his affidavit were enough to induce a reasonably prudent person that a search would uncover evidence of a crime. Notably, Mr. Ray provided insufficient evidence to support his blanket assertion that the Glock auto switches could in fact be used on airsoft guns or that Agent Howard knew they could be used on airsoft guns. Thus, the Court finds that Agent Howard did not make a false statement in the affidavit supporting the search warrant.

### 2. Misleading Omissions in the Affidavit

Mr. Ray also argues in his post-hearing brief that the agents misled the magistrate judge by intentionally or recklessly omitting material information in the affidavit. Mr. Ray argues first that the agents knew the switches could be possessed lawfully if the owner paid the appropriate federal taxes and, second, that the agents knew that machine guns manufactured prior to May 19, 1986 could lawfully be possessed in the United States. [DE 102 at 3-4]. Therefore, Mr. Ray argues, the agents' omissions in the "affidavit submitted to the reviewing court misled the court into thinking that the switches to be seized pursuant to the search warrant were *per se* illegal." *Id*. at 6.

Mr. Ray argues that Agent Lerch worked with Agent Howard on preparing the affidavit and that it was the collective work of both agents. [DE 102 at 2]. He asserts that both agents knew prior to the submission of the affidavit "that an individual could lawfully possess [a]

machine gun including these auto switches if they had paid the appropriate federal taxes." *Id*. at 2-3. Thus, Mr. Ray is arguing that the agents knowingly "*omitted* facts, thereby making the affidavit deceptive." *United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008). The Court notes that "the state of mind of the affiant is not the only relevant one, because 'the validity of the search is not saved if the governmental officer swearing to the affidavit has incorporated an intentional or reckless falsehood told to [him] by another governmental agent.'" *Spears*, 673 F.3d at 604 (citing *United States v. McAllister*, 18 F.3d 1412, 1417 (7th Cir. 1994)). Thus, the knowledge and actions of both Agent Howard and Agent Lerch are relevant to the *Franks* analysis and the Court must review any information they intentionally omitted from the affidavit.

To that end, Mr. Ray argues that paragraphs four and eight of the affidavit were false and misleading because they omitted certain information that demonstrated that a person could legally own a machine gun. Paragraph four states that the switches are machine guns because they are used to convert a firearm to a machine gun. [Def. Ex. H at 057]. Paragraph eight states that "it is unlawful for any person to transfer or possess a machine gun under 18 U.S.C. § 922(o)." [Def. Ex. H at 059]. The Court notes that the ATF Bulletin ("the bulletin")[5] referenced by Agent Lerch in his testimony states the following:

> ATF is not aware of any Glock conversion devices that were developed before May 19, 1986. As such, Glock conversion devices are considered post-1986 machineguns. Therefore, they may only be lawfully possessed by properly licensed Federal Firearms licensees who have paid the appropriate Special Occupational Tax required of those manufacturing, importing, or dealing in NFA firearms under the authority of the United States and any department or agency thereof or a State or a department, agency, or political subdivision thereof. U.S.C. §922(o).

---

[5] Agent Lerch indicated in his testimony that his knowledge of the switches came from the ATF bulletin, which was "sent out to all ATF agents indicating that the ATF had designated the Glock auto switch as a title II weapon, NFA weapon, and that it's a machine gun, and that we were to seize them based upon the cases that were issued to us." [DE 71]. The Court also notes that Defense Exhibit J is the same document as Government Exhibit in-camera 2.

[Def. Ex. J]. Mr. Ray argues that the two paragraphs in the affidavit are erroneous statements because they fail to mention any potential exceptions including two exceptions found in the ATF bulletin which supplied Agent Lerch with the basis for his understanding of the switches.

First, Mr. Ray argues that the agents knew that machine guns, including switches, manufactured prior to May 19, 1986, could lawfully be possessed by persons in the United States. The Firearm Owners Protection Act of 1986 made the possession of machine guns manufactured after May 19, 1986 illegal to possess. Pub. L. No. 99-308. Thus, for Mr. Ray to have lawfully possessed the switches, they must have been manufactured *prior to* May 19, 1986. Officer Barlow testified that while he was unaware of when the switches at issue were manufactured that, in his experience, switches were not manufactured until the late 1990s when the patent for them was filed. [DE 100]. He also stated that he was not personally aware of any pre-1986 Glock auto switches. As the ATF Bulletin demonstrates, the ATF accepted as a policy that all switches were made after 1986 and therefore were considered machine guns. When evaluating the evidence in Mr. Ray's case, the agents were acting under that policy. [Def. Ex. J]. "The *Franks* presumption of validity of an affidavit supporting a search warrant cannot be overcome by a self-serving statement which purports to refute the affidavit." *United States v. Johnson*, 580 F.3d 666, 671 (7th Cir. 2009). Mr. Ray failed to show the Court any evidence that the switches seized here or any switches were manufactured before 1986 thereby making them legal. His statement that they *could* have been manufactured prior to that date is an insufficient argument and fails to show that the agents knew or even thought the switches could possibly be legal due to their manufacturing date.

Second, Mr. Ray argues that it was misleading for the affidavit to state that it was illegal for a person in the United States to possess any machine gun as the federal statute allows for one

exception. The ATF bulletin also states that Glock switches may only be lawfully possessed by properly licensed Federal Firearms licensees who have paid the appropriate Special Occupational Tax required under U.S.C. § 922(o). At the hearing, Agent Lerch testified that it could be possible for someone to legally possess the switches with the proper tax stamps, but he also stated that he conducted a query of the defendant and knew that Mr. Ray did not have any NFA weapons registered in his name. [DE 71]. Agent Lerch shared this information with the AUSA's office. Therefore, when applying for the search warrant the agents knew that Mr. Ray, himself, could not legally possess the switches in question. The search warrant also notes that Mr. Ray was under an Indiana protective order which would have precluded him from legally purchasing or possessing a firearm.

Mr. Ray is right in that paragraph eight of the affidavit omits other portions of § 922(o), most notably that machine guns may be lawfully possessed with the appropriate tax stamp. But as noted above, the agents knew that Mr. Ray did not have the appropriate tax stamp for importing or dealing in NFA firearms and therefore knew that it was unlawful for him to possess the switches. Moreover, the Court notes that the Supreme Court addressed this issue in *Franks*:

> [W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing. This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

438 U.S. at 164–65 (quotation omitted). Here, the agents certainly omitted certain portions of the relevant statute from the affidavit, but the agents left it out because, as Agent Lerch testified, they knew it did not apply to Mr. Ray. The agents knew Mr. Ray could not lawfully possess the switches and thus there was still probable cause to search his home and seize any firearms or

switches found within it. Moreover, the bulletin does not include any mention of the switches being used in airsoft guns. In fact, the bulletin does not make a single reference to airsoft, airsoft guns, or any other potential legal purpose for the switches other than under the tax stamp as mentioned above. [Def. Ex. J]. Mr. Ray provided no evidence demonstrating that he owns such a tax stamp and, on the contrary, Agent Lerch testified that he does not.

Law enforcement officers do not need to provide every single detail of an investigation, but "they may not deliberately omit information the magistrate needs to assess fairly the issue of probable cause." *United States v. McMurtrey*, 704 F.3d 502, 513 (7th Cir. 2013). The affidavit did not need to include an explanation that it could be possible for a person to possess a machine gun with the appropriate tax stamp because the agents knew Mr. Ray did not possess such a stamp and therefore could not legally possess a machine gun. An affiant acts with reckless disregard for the truth when he "'in fact entertain[s] serious doubts as to the truth of his allegations.'" *United States v. Lowe*, 516 F.3d 580, 584 (7th Cir. 2008), quoting *United States v. A Residence Located at 218 Third Street*, 805 F.2d 256, 258 (7th Cir. 1986). But as demonstrated through the testimony of both Agent Howard and Agent Lerch, neither had serious doubts that the switches were illegal machine guns manufactured after 1986, that Mr. Ray did not have a federal tax stamp to legally possess them, or that the switches could be used on airsoft guns.

The Court finds that the agents did not knowingly or intentionally make a false statement or misleading omission with reckless disregard for the truth. Moreover, each of three contested paragraphs (4, 8 and 17) were not false, nor did they omit material information, and each supported the foundation for probable cause for the search warrant. "Probable cause is established when, based on the totality of the circumstances, the affidavit sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of

a crime." *See Illinois v. Gates,* 462 U.S. 213, 238 (1983); *United States v. Garcia,* 528 F.3d 481, 485–86 (7th Cir. 2008). Here, under the totality of the circumstances, the affidavit submitted by Agent Howard with support from Agent Lerch set forth sufficient evidence that was not false or misleading and that would induce a reasonably prudent person to believe that a search of Mr. Ray's house would uncover evidence of a crime. Therefore, the Court finds that the affidavit in support of the search warrant did not contain false statements, did not make misleading omissions, and finds that the affidavit adequately supported the probable cause needed for the search warrant.

### B. *Miranda* Rights

Mr. Ray also asserts that, while interviewing him on the day of the search, the agents did not properly advise him of his *Miranda* rights and did not obtain a voluntary statement from him. Therefore, Mr. Ray argues that his incriminating interview should be suppressed pursuant to *Miranda*, which states that a person who has been "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444.

### 1. Custodial Interrogation

Mr. Ray first argues that his statement to the agents should be suppressed because it was the direct product of his illegal detention in violation of the Fourth Amendment. He states that during the search of his home the agents isolated him in a room away from his family, controlled his movements, and would not allow him to attend to his infant son. These circumstances Mr. Ray argues indicate that he was in custody and subject to custodial interrogation.

Two separate inquiries are critical to determining whether a person is in custody for Miranda purposes: "(1) what were the circumstances surrounding the interrogation; and (2) would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011). As for the circumstances surrounding the interrogation, the Seventh Circuit has identified a number of factors that are indicative of custody, including where the encounter occurred, if the suspect consented to speak with officers, if the suspect was moved to another area, if there was a threatening presence of several officers and a display of weapons or physical force, and the officers' tone of voice. *United States v. Ambrose*, 668 F.3d 943, 956 (7th Cir. 2012). The second inquiry is an objective analysis that does not take subjective views of either the suspect or the law enforcement officers into consideration. "In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt that he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (quotation omitted). Courts must look at the totality of circumstances on an objective basis and whether a reasonable person under the circumstances would have believed they were in custody. *United States v. Thompson*, 496 F.3d 807, 810 (7th Cir. 2007).

The government admits that when the officers initially entered Mr. Ray's home, there was a display of force by the Special Response Team, which involved approximately ten members of different law enforcement agencies. [DE 49 at 21]. Mr. Ray's grandfather testified that he woke up to several officers in his bedroom pointing flashlights and two assault rifles at him while he was still in bed. [DE 71]. But after the initial sweep, not all members of the task force team remained on site. Once his family (mother, grandfather, and infant son) were taken to

the kitchen of his home, Agent Howard and Agent Lerch escorted Mr. Ray to one of the bedrooms. Thus, Mr. Ray was not transported off-site or to a police station for questioning, but instead was escorted to a familiar location within his home. At one point during the interview though, Mr. Ray was not allowed to attend to his three-month old baby who was crying and both Agent Howard and Agent Lerch confirmed this. During his testimony, Agent Howard stated the following:

> Q. Was [Mr. Ray] free to get up and care for his son?
> A. We requested that he stay with us.

[DE 71]. When testifying about the same exchange with Mr. Ray, Agent Lerch stated:

> Q. You directed that he stay there?
> A. Yes, correct.
> Q. So at least at that point he was not free to leave the bedroom?
> A. Yes.

[DE 71]. These exchanges demonstrate that Mr. Ray was not free to leave the room where he was being interviewed by the agents. Moreover, Mr. Ray testified, "I don't think anyone in my house had the right to do anything. We were subject to whatever we were told to do." [DE 92 at 16]. There is no evidence that Mr. Ray was handcuffed during the encounter, although he testified that his grandfather was handcuffed for a short period of time. *Id*. at 15.

First, the Court notes that officers have the authority to detain any occupants of a premises that is the subject of a search warrant. *Michigan v. Summers*, 452 U.S. 692, 705 (1981). Mr. Ray was present at his home when the agents executed the search, so even if he was detained, the detention would have been lawful. Next, the Court must consider whether Mr. Ray was in custody after he was escorted to the bedroom with the two agents. Several factors support a finding of custody: there was an initial show of force, Mr. Ray was moved to a different area of the home away from his family, and Mr. Ray not allowed to leave the room upon request.

On the other hand, Mr. Ray was in the familiar surroundings of his home, he was not told he was under arrest, and there are no allegations that the interview was hostile or combative. *See United States v. Borostowski*, 775 F.3d 851, 860 (7th Cir. 2014).

Here, under a totality of the circumstances on an objective basis, a reasonable person under similar circumstances would not have felt that he or she was at liberty to terminate the interview or leave the room. *Ambrose*, 668 F.3d at 954-55. The morning started with an overwhelming display of force as approximately ten officers with firearms drawn participated in the initial raid and search. Moreover, at least one of his family members was handcuffed for a period of time. Mr. Ray, himself, was separated from his family and escorted to a small bedroom where he was not permitted to leave upon request by the two agents conducting the interview. Therefore, the Court finds that Mr. Ray was in custody at the time of his interview with the agents. But, the Court's analysis under *Miranda* does not end here. Under *Miranda*, "the government may not use statements stemming from the custodial interrogation of a defendant unless the government has utilized procedural safeguards effective to secure the privilege against self-incrimination." *Berkemer v. McCarty,* 468 U.S. 420, 428 (1984). Upon a finding that a defendant was in custody, then the Court must determine whether he adequately waived his *Miranda* rights.

### 2. Adequate Waiver of *Miranda* Rights

Mr. Ray also argues that the agents failed to properly advise him of his *Miranda* rights and did not tell him that he was signing a *Miranda* rights waiver form. Mr. Ray states that the agents did not advise the defendant of his *Miranda* rights while the audio recording device was on and that the agents represented to him that the form he was signing did not relate to his *Miranda* rights. [DE 22 at 21]. Mr. Ray also points to his limited education and his learning

difficulties to support his contention that the agents misrepresented the waiver form and thus the government cannot show a proper waiver of his *Miranda* rights. A defendant's "statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived Miranda rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (citation and alteration omitted). A knowing waiver requires "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. (citation omitted). The government bears the burden of proof in demonstrating the defendant's *Miranda* waiver and the voluntariness of his confession. *United States v. Stewart*, 536 F.3d 714, 719 (7th Cir. 2008).

The government asserts that the waiver form clearly refers to a defendant's *Miranda* rights and that Agent Howard read it to Mr. Ray verbatim on the day of the interview. [DE 49 at 23; Def. Ex. G]. Agent Howard testified that as soon as Mr. Ray was escorted to the bedroom, he told him that he needed to advise him of his *Miranda* rights and that he gives all suspects their *Miranda* rights as a matter of course before speaking with them. [DE 71]. Once the agents were in the bedroom with Mr. Ray, Agent Howard presented him with a single *Miranda* rights waiver form at the outset of the interview. *Id*. Agent Howard then read the form verbatim aloud even though Mr. Ray stated that he could read and write. Agent Lerch confirmed this in his testimony as well. [DE 71]. Agent Howard testified:

> Q: Was there anything about that interaction that suggested Mr. Ray didn't understand what you were telling him?
> A: No, in fact, as I do this, I like to keep an eye on the individual I am reading it to and it looked to me that he appeared to be reading and following along and reacting to that indicated to me that he was paying attention.

*Id*. Agent Howard also stated that Mr. Ray did not ask him any questions about the waiver form or any of the information he was telling him. Moreover, in the recorded portion of the interview, Agent Howard had this exchange with Mr. Ray:

> Agent Howard: Yeah. Right now it's 8:41. We can just kind of go back over what we talked about here. So we came back here. I went over your Miranda rights with you. We signed all that. We talked, went all through it. You understood that. And you said you wanted to talk with us, right? Is that yeah?
> Mr. Ray: Yeah.

[Def. Ex. I at 6]. This exchange demonstrates that Mr. Ray agreed with Agent Howard's summary of what occurred earlier in their conversation and that he did not protest Agent Howard's characterization of the exchange.

Here, the record lends no support to the contention that Mr. Ray did not understand his *Miranda* rights or that he was waiving them. Although the Court notes that the lack of recording from the first third of the interview with Mr. Ray is irregular, Agent Howard explained how that inadvertently happened and, once the recording started, was sure to summarize what they had discussed in the first third of the conversation. Moreover, the Court also notes that the signed *Miranda* waiver form is simple, straightforward, and was read verbatim aloud to Mr. Ray before he signed it. [Def. Ex. G]. The government was able to demonstrate that *Miranda* warnings were given to Mr. Ray, he explicitly waived them by signing the waiver [Def. Ex. G], and that Mr. Ray understood what he was waiving as he did not seek clarification from either agent. *See United States v. Quiroz*, 874 F.3d 562, 567 (7th Cir. 2017). More importantly, the facts of this case do not establish that the agents used any improper threats or coercion or did anything else to render Mr. Ray's statements involuntary. *See United States v. Stadfeld*, 689 F.3d 705, 709 (7th Cir. 2012) (noting that a confession is voluntary and admissible if, in the totality of circumstances, it is the product of a rational intellect and free will and not the result of physical

abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will).

Here, the totality of the circumstances demonstrates that it is more likely than not that Mr. Ray understood his rights and his waiver of them. Therefore, the Court finds that while Mr. Ray was in custody during the interview, he knowingly and voluntarily waived his *Miranda* rights.

### III.  CONCLUSION

For the reasons explained above, the Court DENIES the motion to suppress.  [DE 22].

SO ORDERED.

ENTERED:  April 2, 2020

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court